O

# United States District Court
# Central District of California

| | |
|---|---|
| TERRI GIBSON, and all other aggrieved employees,<br><br>                Plaintiffs,<br><br>      v.<br><br>SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, et al.,<br><br>                Defendants. | Case № 5:20-cv-00318-ODW (SPx)<br><br>**ORDER DENYING SECOND RENEWED MOTION FOR APPROVAL OF PAGA SETTLEMENT [34]** |

## I. INTRODUCTION

Plaintiff Terri Gibson brings this diversity action against Defendants Swift Transportation Co. of Arizona, LLC and Swift Transportation Services, LLC (together, "Swift") under California's Private Attorneys General Act ("PAGA"). (Second Am. Compl. ("SAC"), ECF No. 19.) With her sole cause of action under PAGA, Gibson alleges that Swift violated California Labor Code provisions governing overtime wages, meal and rest breaks, accurate wage statements, and waiting time penalties. (SAC ¶¶ 32–36.) The parties have reached an agreement through mediation ("Settlement"), and Gibson now moves a third time for approval of the Settlement. (Mot., ECF No. 34.)

After carefully considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the following reasons, the Motion is **DENIED**.

## II. BACKGROUND

From October 24, 2004, through September 1, 2019, Swift employed Gibson as a dispatcher. Gibson brings her PAGA claim as a proxy for the State of California and as a representative of 232 similarly aggrieved employees who allegedly experienced California Labor Code violations between February 18, 2019, and April 30, 2021. (SAC ¶ 2; Mot. 3.) Gibson alleges that Swift violated California Labor Code sections 203, 226, 226.7, 510, 512, and 1194 by failing to provide (1) properly calculated overtime wages, (2) compliant meal periods or premium pay; (3) compliant rest periods or premium pay; (4) accurate wage statements; and (5) waiting time penalties. (SAC ¶¶ 32–36.) Gibson's PAGA claim covers a total of 9,614[1] employee pay periods. (Mot. 3.)

The parties stipulated to settling for $288,420, inclusive of attorneys' fees, costs, a service award, a settlement administrator fee, and payments to the Labor & Workforce Development Agency ("LWDA") and the aggrieved employees. (*See, e.g.*, First Mot. Approval PAGA Settlement 6, ECF No. 28.) The Settlement would be distributed as follows.

- $96,140 in attorneys' fees (one-third of the total Settlement);
- $15,000 in litigation costs;
- $7,500 service award to Gibson;
- $3,000 settlement administrator costs to a third-party, Phoenix Class Action Settlement Administrators;
- $125,085 in PAGA penalties (75% of the remaining funds), paid to the LWDA; and

---

[1] The precise number of pay periods calculated according to Gibson's expert's methodology was 9,613.56. (Mot. 3 n.1.) Swift does not appear to contest this figure, so the Court uses 9,613.56 total pay periods in its calculations herein.

2

- $41,695 in PAGA penalties (25% of the remaining funds), distributed pro rata among the allegedly aggrieved employees.

(Mot. 10.)

The Court denied the parties' first motion for settlement approval, noting the paucity of evidence supporting the proposed settlement award and supporting calculations. (Order Den. First Mot. 6–7, ECF No. 30.) The parties proceeded to file a second settlement approval motion, and the Court found that the additional information the parties provided remained insufficient to allow the Court to determine that the Settlement was fair and reasonable. (Order Den. Second Mot. 8–9, ECF No. 33.) The Court denied the second motion without prejudice, instructing the parties to provide the Court with more information about their damages model so that the Court could replicate and confirm the parties' calculations. (*Id.* at 9.)

The parties heeded the Court's directive in filing their third Motion, and the Court now has sufficient information to determine if the Settlement is fair and reasonable. As the following analysis reveals, the parties' proposed Settlement differs from the Court's expected value analysis by a factor of approximately four, such that the Settlement is outside the range of fair and reasonable.

### III. LEGAL STANDARD

An employee suing her employer under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). "In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency." *Id.*

California Labor Code section 2699(l)(2) provides that the "court shall review and approve any settlement of any civil action filed" under PAGA. However, "PAGA does not set a clear standard for evaluating settlements." *Basiliali v. Allegiant Air, LLC*, No. 2:18-cv-03888-RGK (MRWx), 2019 WL 8107885, at *3 (C.D. Cal. July 1,

2019) (collecting cases). "Indeed, the LWDA has stated that 'the LWDA is not aware of any existing case law establishing a specific benchmark for PAGA settlements.'" *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK, 2017 WL 3670794, at *3 (N.D. Cal. Aug. 25, 2017). "But district courts, wary of plaintiffs using a PAGA claim as a bargaining chip without due consideration of the public interest and the rights of other aggrieved individuals, must still analyze PAGA settlements to ensure that the terms are fair." *Basiliali*, 2019 WL 8107885, at *3 (internal quotation marks and citation omitted). Accordingly, courts in this Circuit approve PAGA settlements where "(1) the statutory requirements set forth by PAGA have been satisfied, and (2) the settlement agreement is fa[ir], reasonable, and adequate in view of PAGA's public policy goals." *Id.* (collecting cases).

To evaluate the fairness of a proposed PAGA settlement, some courts have considered: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the amount offered in settlement; (4) the extent of discovery completed and the stage of the proceedings; (5) the presence of government participation; and (6) the expertise and views of counsel." *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019) (applying factors set forth in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). Ultimately, the question courts must answer is whether the proposed settlement "would support PAGA's interest in augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance." *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1135 (N.D. Cal. 2016) (internal quotation marks omitted).

## IV.   ANALYSIS

The primary consideration in evaluating the fairness of a PAGA settlement is the extent to which the settlement amount approximates the value of the case. *Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1011 (E.D. Cal. 2019) ("[T]he Court must consider the amount obtained . . . against the estimated value of the class claims if

1 successfully litigated."). This corresponds to the first and third factors described in
2 *Patel* and *Hanlon*. *Patel*, 2019 WL 2029061, at *2. To explore this issue, the Court
3 conducts an expected value analysis.

4       To understand the concept of expected value, "imagine an individual is given a
5 lottery ticket for a drawing with a prize valued at $100. Imagine further that only one
6 other lottery ticket was sold, and that the odds of winning stand at 50%. The expected
7 value of that ticket is therefore $50." *Marshall Naify Revocable Tr. v. U.S.*, No. C
8 09-1604 CRB, 2010 WL 3619813, at *5 n.8 (N.D. Cal. Sept. 9, 2010). As an example
9 of expected value applied to a claim for damages, imagine a plaintiff has a claim
10 worth a potential maximum of $100,000, but there is a 50% chance that the judge will
11 find for the defendant on a dispositive legal issue and a 25% chance that the jury will
12 find for the defendant on a dispositive factual issue. The expected value of the
13 plaintiff's claim is $100,000 x 50% x 25% = $12,500.

14       The Court proceeds by analyzing each PAGA violation individually, making
15 numerical findings and using an expected value analysis to estimate the total PAGA
16 exposure. While the parties are correct that estimating PAGA liability is an
17 "inherently speculative exercise," (Mot. 8), the degree of speculation can be decreased
18 by breaking each claim down into its component issues and making reasoned findings
19 regarding each issue, as follows.[2]

---

[2] Some courts in the Ninth Circuit have noted, usually in the context of class action settlements, that in evaluating the strength of a plaintiff's case, "a proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class." *See, e.g., Gatdula v. CRST Int'l, Inc.*, No. CV 11-01285 VAP (OPx), 2015 WL 12697656, at *4 (C.D. Cal. Aug. 26, 2015). This directive, which traces to a quote from a treatise, *see Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 5 *Moore Federal Practice,* § 23.85[2][b] (Matthew Bender 3d. ed.)), appears at odds with the obligation of the court to ensure that proposed settlements are "fundamentally fair, adequate, and reasonable." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998). In any case, courts in the Ninth Circuit continue to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Benitez v. W. Milling, Inc.*, No. 1:18-cv-01484-SKO, 2020 WL 3412725, at *5 (E.D. Cal. June 22, 2020) *Carlin*, 380 F. Supp. 3d at 1011. Given that the value of a PAGA claim is so

### A. Overtime Pay Violation Penalties

Gibson contends that Swift failed to properly calculate overtime pay by failing to include employees' non-discretionary bonuses in the calculation of employees' regular rate of pay.[3] (SAC ¶¶ 18–21.) This caused Gibson's regular rate of pay to be artificially deflated, which, in turn, caused Gibson and other Swift employees to receive less overtime pay than that to which they were statutorily entitled.

The parties assert that the penalties of $100 per pay period for initial violations and $250 per pay period for subsequent violations found in Labor Code section 1197.1 apply to Gibson's overtime claim. (Mot. 5.) In its prior Order, the Court expressed doubt about the applicability of section 1197.1 penalties, suggesting that the lower penalties provided by Labor Code section 558 applied instead. (Order Den. Second Mot. 7.) In response, the parties provide the court with alternate calculations under each statute, but they present no argument regarding which statute in fact applies. (*See* Mot. 5.)

The Court finds that section 558 is more applicable here. Section 558 provides a penalty for violations of "this chapter," which includes section 510 governing how overtime pay is to be calculated. Section 1197.1, by contrast, contains express language related to minimum wage, not overtime pay. Thus, the penalty for the overtime violations Gibson alleges is $50 per pay period for initial violations and $100 per pay period for subsequent violations. *See* Cal. Lab. Code § 558.

Under the approach set forth in *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157 (2008), a violation is "subsequent" only after the employer has been notified in

---

heavily dependent on a mathematical exposure analysis, the expected value analysis is an acceptable way of evaluating the fairness, reasonableness, and adequacy of a PAGA settlement.

[3] "Regular rate of pay" is a term of art which refers to the weighted average hourly rate received by an employee during a given pay period. 29 C.F.R. § 778.109; *see* 29 C.F.R. § 778.115. Overtime pay is calculated by multiplying the regular rate of pay by 1.5. Cal. Lab. Code § 510; *See, e.g.*, *Duplesse v. County of Los Angeles*, 714 F. Supp. 2d 1045, 1055 (C.D. Cal. 2010); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 (2d Cir. 2007).

writing of the violation. The parties appear to agree that Swift never received notice in writing of its overtime violations. (Mot. 4.) Thus, the operative penalty rate is $50 per pay period.

### 1. Total potential exposure

The parties indicate that 59.6% of the 9613.56 pay periods at issue contained an overtime violation. (*See* Mot. 5.) Gibson's expert arrived at a 59.6% violation rate by analyzing a sample of 15% of the payroll records at issue and concluding that in 59.6% of pay periods, a bonus was paid in the same pay period that overtime was worked. (Decl. Manny Starr ("Starr Decl.") ¶ 6, ECF No. 34-1.) Swift does not appear to contend that this method was unsound. Accordingly, the Court takes the 59.6% violation rate and the corresponding number of pay periods as proper. The Court calculates the total number of violative pay periods as 9,613.56 x 59.6% = 5,729.68 (a number that varies slightly from the parties' own calculations).

Thus, there are 5,729.68 violative pay periods at a penalty rate of $50 per pay period. The potential maximum exposure rate for overtime violations is therefore 5,729.68 x $50 = **$286,484.00**.

### 2. Legal dispute: discretionary or non-discretionary nature of bonuses

The parties' main dispute regarding the overtime pay violations is whether the bonuses at issue—the ones that allegedly should have been included in the calculation of the regular rate of pay—were discretionary or non-discretionary. (Mot. 5–6.)

For a bonus to be discretionary, "the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid." 29 C.F.R. § 778.211(b). The amount of the bonus must be "determined by the employer without prior promise or agreement. The employee has no contract right, express or implied, to any amount." *Id.* By contrast, any bonus paid pursuant to any sort of contract, agreement, or promise is non-discretionary. *Id.* § 778.211(c). Thus, bonuses awarded to "induce [employees] to work more steadily or more rapidly or more efficiently or to remain with the firm,"

along with "[m]ost attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work," and bonuses contingent upon continued employment up to a particular bonus payment date are all non-discretionary. *Id.* Non-discretionary bonuses must be included in the regular rate of pay; discretionary bonuses are excluded from the regular rate of pay. *Id.* § 778.211(a). Thus, here, if the bonuses at issue were discretionary, there was no overtime violation at all, and no PAGA penalties for overtime violations are available.

Swift indicates that its bonuses were discretionary because it "did not promise in advance to pay any employee any bonus, and that the bonuses it did pay were not based on any pre-determined criteria. Swift maintained it never abandoned discretion by promising a bonus to its employees in advance." (Mot. 6.) Gibson, by contrast, does not put forth any case-specific argument regarding why the bonuses in this matter were non-discretionary. (*See generally* Mot.) Swift's argument on this point is significantly stronger than Gibson's, and accordingly, the Court finds that there is an estimated **40% chance** that Gibson would be able to prove at trial that the bonuses are non-discretionary.

The Court will return to the bolded figures at the end of this Order for the final expected value calculations. For now, the Court turns to the remaining alleged Labor Code violations.

B. **Meal Break Violation Penalties**

Gibson's meal break claim is based on allegations that Swift employees either (1) were unable to take full 30-minute meal breaks; (2) were not permitted to take meal breaks until after the fifth hour of work; or (3) had to forego their meal breaks altogether.

PAGA penalties for meal break violations, like those for overtime pay violations, are fixed by California Labor Code § 558. *See* Cal. Lab. Code § 512 (obligating employers, in same chapter as section 558, to provide meal periods); *Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1154–55 (2012),

8

*disapproved of on other grounds by ZB, N.A. v. Superior Court*, 8 Cal. 5th 175 (2019). As with the overtime violations, the parties do not dispute that all violations in this case are "initial" because Swift never received written notice of the violations during the PAGA period. Thus, the operative penalty is $50 per pay period.

### 1. Total potential exposure

Gibson's analysis of the payroll data indicated that 76.2% of pay periods included meal breaks that appeared on the face of the records to be non-compliant either because the meal break was less than 30 minutes, was taken late, or was not recorded at all. (Starr Decl. ¶ 8.) Gibson assumes that every one of these meal breaks constituted a Labor Code violation.

Swift argues that this analysis fails to account for the California Supreme Court's analysis in *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012). (Mot. 7.) In *Brinker*, the court defined a compliant off-duty meal period as one in which the employer has relieved the employee of all duty. 53 Cal. 4th at 1039–40. The court further clarified that employers are not required to police meal breaks to ensure employees are not working. *Id.* at 1040. Thus, if an employer relieves an employee of duty at the appropriate time and the employee nevertheless voluntarily chooses to come back from a break early or take a break late, there is no Labor Code violation. *See id.* at 1040–41.

The question, therefore, is not whether a given employee in fact worked during the meal break period, but rather whether the employer required the employee to work during the meal break period. Swift argues that Gibson's 76.2% estimate is overstated because it is based merely on when a given employee clocked in and clocked out, not when Swift actually relieved that employee of any official duties. (Mot. 7.) Thus, for example, Swift might have relieved an employee of duty five hours into his or her shift, but the employee might have chosen not to clock out until fifteen minutes later. This scenario would register as a violation under Gibson's expert's analysis, even

though in this scenario Swift in fact relieved the employee of duty as required, thus initiating a compliant meal break.

The parties make no factual showing regarding any Swift employee's experience with their meal breaks. Even so, Swift's argument has merit, and it would be unjust and inequitable to ignore this argument in calculating the total estimated penalty. Based on the papers as submitted, the Court finds that, of the pay periods designated by Gibson's expert as violations based on payroll analysis alone, a fair estimate of the percentage of those pay periods in which a violation in fact occurred is 40%. Thus, the better estimate of the number of pay periods containing meal break violations is (9,613.56 x 76.2%) x 40% = 2,930.21 pay periods. At $50 per violation, the total potential penalty for meal break violations is 2,930.21 x $50 = **$146,510.50**.

  *2. Legal argument: class/representative treatment of meal break claim*

Swift points out that, had this case gone to bench trial, the Court might have found treatment of the meal break claims on a class-wide basis to be unmanageable and might have denied any relief whatsoever under PAGA. (Mot. 8.) This argument appears to have substantial merit. Courts have repeatedly dismissed PAGA claims based on meal break violations as unmanageable. *See, e.g.*, *Amiri v. Cox Commcn's Cal., LLC*, 272 F. Supp. 3d 1187, 1195 (C.D Cal. 2017) ("Plaintiff's PAGA representative claim based on failure to provide meal and rest periods thus requires numerous individualized determinations that make his claim unmanageable."); *Raphael v. Tesoro Refining & Mktg. Co. LLC*, No. 2:15-cv-02862-ODW, 2015 WL 5680310, at *3 (C.D. Cal. Sept. 25 2015) (dismissing PAGA representative claims, including claim for failure to provide meal and rest periods, as "nothing short of unmanageable"). The Court finds that similar reasoning would apply to the meal break claim here. The claim is based on the contention that Swift failed to relieve employees of duty as required and that these failures manifest in various irregularities in the payroll data. The numerous individualized determinations that would be required to resolve this claim make it an unlikely candidate for representative

treatment, and the Court correspondingly finds Gibson would have an estimated **30% chance** of overcoming this concern had this claim gone to trial.

### C. Rest Break Violation Penalties

Gibson's rest break claim is based on the somewhat conclusory allegation that Swift "regularly failed to provide . . . [e]mployees with statutorily compliant rest breaks and likewise failed to pay them one hour of premium pay in lieu of missed rest breaks." (SAC ¶ 24.) The Motion does not provide any further detail and simply indicates that "rest breaks were not provided in a legally compliant manner." (Mot. 6.) Swift maintains that it had a legally compliant rest break policy and that there were no rest break violations at all. (Mot. 8.)

Like meal break penalties, rest break penalties are assessed at $50 for the initial violation and $100 for subsequent violations, *Thurman*, 203 Cal. App. 4th at 1154–55, and the parties do not dispute that all putative violations in this case are "initial," *see* Cal. Lab. Code § 2699(f)(2).

Gibson clarifies that the assumption in the calculations is that 100% of the at-issue pay periods contained a rest break violation. Thus, Gibson appears to be alleging that some sort of uniform or company-wide policy or practice caused there to be a complete lack of rest breaks whatsoever or caused the rest breaks that were given to be defective in some other capacity.[4]

A 100% violation rate means a total potential PAGA penalty of 9,613.56 x $50 = **$480,678**. That said, if the Court is to accept Gibson's assertion that each and every

---

[4] To be sure, some courts in the Ninth Circuit have found, usually in the remand context, that allegations or evidence of a uniform policy or systematic scheme of wage abuse do not require a court to assume a 100% violation rate. *See, e.g.*, *Vilitchai v. Ametek Programmable Power, Inc.*, No. 3:15-CV-1957-L (BLM), 2017 WL 875595, at *3 (S.D. Cal. Mar. 6, 2017). Here, however, Gibson's assertion is the reverse: she argues from the premise, not the conclusion, that there was a 100% violation rate. The Court cannot conceive of a scenario where 100% of the pay periods involved a rest break violation and those violations were *not* the result of a uniform policy. Put differently: it is implausible to think that each and every employee could have been deprived of a rest break in each and every pay period due to the result of individualized, non-policy-based denials of rest breaks.

pay period had a rest break violation, the Court must proceed to ask exactly what policy or practice caused a rest break violation in each and every pay period. If such a policy or practice exists, Gibson should be able to articulate it, based on her experience and that of other aggrieved employees. But Gibson fails to do so and simply reiterates the highly conclusory assertion that the rest breaks were not "legally compliant." (Mot. 6.) This raises serious doubts about whether there was indeed a company practice or policy that caused widespread rest break violations.

In light of these observations, the Court finds that there is a very low probability that Gibson would have succeeded at trial in proving that Swift acted in a way that deprived employees of their rest breaks in 100% of the at-issue pay periods. The Court sets this estimated probability at **5%**.

### D. Wage Statement Violations

Gibson alleges that due to the error in overtime pay calculation described above, the aggrieved employees' wage statements were inaccurate, in that they did not list the correct hourly rates, purportedly in violation of California Labor Code section 226(a)(9). (SAC ¶ 25.)

An initial question is which penalty provision applies to this claim. Labor Code section 226.3 provides for penalties when an employer "fails to provide the employee a wage deduction statement or fails to keep the records required" by section 226(a) in the amount of $250 for initial violations and $1,000 for subsequent violations. Labor Code section 2699(f)(2), by contrast, is PAGA's "default" provision which applies in the absence of an express penalty provision and imposes a $100 penalty for initial violations and a $250 penalty for subsequent violations. If section 226.3's higher penalties do not apply, then the section 2699(f)(2) default penalties do.

The plain language of section 226.3 makes no reference to inaccuracies or errors in otherwise timely wage statements and instead suggests that the higher penalties are for when an employer fails to provide a statement or keep the required records altogether. Several courts have made a similar finding and found the default

penalties to be appropriate in cases of errors or omissions on wage statements. *See York v. Starbucks Corp.*, No. CV-08-07919 GAF (PJWx), 2012 WL 10890355, at *8 (C.D. Cal. Nov. 1, 2012); *Fleming v. Covidien, Inc.*, 2011 WL 7563047, No. ED CV-10-01487 RGK (OPx), at *3 (C.D. Cal. Aug. 12, 2011). Thus, the Court concludes that section 226.3 does not apply to this claim and that, instead, the section 2699(f)(2) default penalties govern. As before, the parties agree that all violations in this case are "initial," so the operative penalty is $100 per pay period.

The total potential exposure for this claim is calculated as follows. Because this claim is derivative, the number of pay periods containing a wage statement violation is the same as the number of pay periods calculated to contain an overtime underpayment violation, which, as discussed above, is 5,729.68. Thus, the total potential exposure for this claim is 5,729.68 pay periods x $100 per pay period = **$572,968.00**.

That said, the wage statement violation that Gibson is alleging here is precisely the kind of error courts, including this one, have repeatedly found *not* to constitute a Labor Code violation. *Rudolph v. Herc Rentals, Inc.*, No. 2:20-cv-05412-ODW (Ex), 2021 WL 5994514, at *4 (C.D. Cal. Aug. 27, 2021) ("[A]n employer does not violate section 226 merely because a wage statement lists a rate or figure which is itself a violation of some other substantive wage-and-hour provision."); *Parsittie v. Schneider Logistics, Inc.*, No. 19-3981-MWF (AFMx), 2020 WL 2120003, at *7 (C.D. Cal. Oct. 29, 2019) (holding recovery under derivative section 226 claim based on unpaid wages "impermissible because section 226 is not intended to permit a 'double recovery'"), *reversed in part on other grounds*, 859 F. App'x 106 (9th Cir. 2021). The law in this area appears clear as of *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308 (2018), in which the California Court of Appeal held that there is no wage statement violation when, "at the time the work was performed, the work was done and paid for at a particular rate, but it was subsequently determined that the employee had actually earned the right to additional compensation." *Id.* at 1336; *see*

*id.* at 1337 (holding that "the absence of accurate *wages earned* will be remedied by the violated wage and hour law itself," not by Labor Code section 226). The Court therefore finds that there is an estimated **3% chance** that Gibson would have succeeded on this theory of legal liability at bench trial.

### E. Waiting Time Penalties

The final component of Gibson's PAGA claim is waiting time penalties. California Labor Code sections 203 and 218 provide that an employee is entitled to additional damages in the form of waiting time penalties when the employee is not paid all wages due at the time of his or her termination. Thus, the theory goes, a waiting time violation occurs—and a corresponding PAGA penalty attaches—when an employer fails to pay an employee all wages due upon separation.

Gibson alleges that all employees whose overtime pay was miscalculated and whose employment ended during the PAGA period also experienced a waiting time violation because Swift did not pay them the overtime wages to which they were entitled upon termination. Gibson's expert calculated, based on a sample of employees, that a total of 50.15 former employees allegedly experienced overtime violations for which waiting time penalties would be owed. (Starr Decl. ¶ 10.) Moreover, the section 2699(f)(2) default PAGA penalties apply to waiting time violations, and the $100 initial penalty rate is applicable to all violations here. Gibson therefore calculates the total potential PAGA penalty to be 50.15 x $100 = **$5,015**.

It is rather likely that Swift's overtime miscalculations do not also constitute a waiting time violation for the same reason that they do not also constitute a wage statement violation: to allow recovery on a waiting time violation theory in addition to an overtime violation theory would be an impermissible double recovery. However, there is less case law on double recovery in the PAGA waiting time context than there is in the PAGA wage statement context, such that the claim may not be so likely to fail. Based on these considerations, the Court finds that there is an estimated **20% chance** Gibson would have been able to recover on this legal theory at trial.

14

### F. Discretion to Reduce Penalties

California Labor Code section 2699(e)(2) provides courts with discretion to reduce a civil penalty under PAGA if the full award would result in an award that is unjust, arbitrary, and oppressive, or confiscatory. For example, in *Carrington v. Starbucks Corp.*, 30 Cal. App. 5th 504, 529 (2018), despite the fact that the plaintiff prevailed on the PAGA claim at trial, the court reduced the maximum PAGA penalty amount by 90 percent based on the employer's "good faith attempts" to comply with the law and because the violations were "minimal."

Here, the parties do not provide the Court with any information regarding the severity of the overtime payment violations. Thus, the Court has no way to know whether each of the 9,000-some pay periods in which a violation purportedly occurred corresponded to an underpayment of a few cents or to a more significant underpayment. This difference is material to whether and to what extent the Court should reduce the penalty. Swift's good faith may be material, too, because the distinction between a discretionary bonus and a non-discretionary bonus is not always clear, and there is no indication that the bonuses at issue were so obviously non-discretionary that Swift's failure to include them in the regular rate of pay was willful or in bad faith.

As for the meal and rest break violations, there is likewise no concrete indication anywhere in the Motion that the violations, to the extent any occurred, occurred due to bad faith or willful behavior on the part of Swift.

Finally, the wage statement and waiting time claims are derivative of the foregoing claims, so any rationale supporting reducing the penalty on the foregoing claims would apply equally to reducing the penalty on the wage statement and waiting time claims.

Based on all these considerations, the Court finds that a discretionary reduction of the overtime penalties to **25%** of its theoretical total, and of all other penalties to **50%** of their theoretical totals, would be appropriately applied. *See Fleming*,

2011 WL 7563047, at *4 (exercising discretion and reducing PAGA penalty for erroneous wage statements by 78%, from theoretical maximum of $2.8 million to $500,000).

## G. Expected Value Calculations

What remains is to bring all the bolded figures together into an expected value analysis, as follows. The numbers in the "totals" column are calculated by multiplying the three preceding values in each row from left to right.

| Labor Code Violation | Total Potential Exposure | Expected Success (Flaw in Claim) | Discretionary Deduction | Totals |
|---|---|---|---|---|
| Overtime | $286,484.00 | 40% (nature of bonus) | 25% | $28,648.40 |
| Meal Break | $146,510.50 | 30% (class treatment) | 50% | $21,967.58 |
| Rest Break | $480,678.00 | 5% (problems of proof) | 50% | $12,016.95 |
| Wage Statement | $572,968.00 | 3% (derivative claim) | 50% | $8,594.52 |
| Waiting Time | $5,015.00 | 20% (derivative claim) | 50% | $501.50 |
| | | | Total Expected Value of PAGA Penalties: | **$71,728.95** |

The proposed settlement is $288,420, and the Court's calculated expected value is $71,728.95, a difference of a factor of approximately four. This is a significant difference, and it gives the Court pause to consider whether the Settlement is fair and reasonable in light of PAGA's goals.[5] *Basiliali*, 2019 WL 8107885, at *3. That said, the Court should give significant weight and consideration to the amount to which the

---

[5] Courts in the Ninth Circuit have observed that a settlement can be acceptable "even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527. This analysis, however, is typically used to justify approving settlements that are significantly *less* than the total recovery, ostensibly as a rough exchange for avoiding "the risk, expense, complexity, and . . . duration of further litigation." *Id.* at 525. When the proposed settlement is several times *more* than the total potential recovery, then there is much less need to consider the risk to the plaintiff associated with further litigation.

1  parties agreed. *See Carlin*, 380 F. Supp. 3d at 1011 (emphasizing that the amount offered in settlement is among "the most important considerations of any class settlement"); *Patel*, 2019 WL 2029061, at *2; *Hanlon*, 150 F.3d at 1026. Consistent with this principle, the Court is willing to approve of a settlement whose total value is the arithmetic mean of the Court's calculated expected value and the parties' proposed amount. Under this approach, that amount is ($71,728.95 + $288,420) / 2 = **$180,074.48**. The Court is satisfied that this amount furthers PAGA's purpose as an extension of the State's enforcement power by amply encouraging compliance with California labor law and deterring noncompliance. *O'Connor*, 201 F. Supp. 3d at 1135.

Accordingly, the parties are invited to file an Amended Proposed Settlement using $180,074.48 as the total settlement value, and, provided that the breakdown of the settlement conforms to the Court's findings herein regarding attorneys' fees and Gibson's enhancement payment, the Court will approve the Settlement without the need for another motion.

**H.   Attorneys' Fees**

The Court proceeds to determine whether the proposed attorney fee award is fair and reasonable. District courts in the Ninth Circuit approving class and representative settlements "typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).

Here, the Settlement includes an award of $96,140 in attorneys' fees to Gibson's attorneys, which represents one-third of the total proposed settlement amount. Although an attorney fee award totaling one-third of the total settlement amount is "within the range of percentages which courts have considered reasonable," *Marshall v. Northrop Grumman Corp.*, No. 16-CV-6794 AB (JCx), 2020 WL 5668935, at *8 (C.D. Cal. Sept. 18, 2020) (collecting cases), in this case, the Court

finds that the skill exhibited by Gibson's attorneys is less than that required to justify an award of one-third the settlement as fees. Despite the fact that the parties used both a wage-and-hour damages consultant and a wage-and-hour mediator, Gibson's justification of the total settlement award ultimately came down to a final step involving a very imprecise hacking down of the purported "realistic PAGA penalty exposure" by 75%, without any justification for why a reduction of 75% is itself reasonable or justifiable. (Mot. 10.) Moreover, Gibson's attorneys do not appear to have exercised great skill or special effort in proving up any of the unique aspects of the PAGA claim. Many of Gibson's calculations and contentions are based on standard payroll data analysis, which in this case was at least partially outsourced.

Based on the foregoing observations, the Court approves an attorney fee award of **25%** of the total settlement amount. *See Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, 253 F. Supp. 3d 1074, 1076–77 (C.D. Cal. 2017) (significantly reducing and reallocating attorney fee portion of PAGA settlement due to plaintiff's counsel's failure to respond to the court's inquiry regarding the reasonableness of the settlement).

## I.   Enhancement Payment

Finally, the parties request the Court's approval of a $7,500 enhancement payment to Gibson, the named Plaintiff in this case. In the Ninth Circuit, an enhancement payment of $5,000 is "presumptively reasonable." *Jacobs. v Cal. St. Auto. Ass'n Inter-Ins. Bureau*, No. C 07-00362 MHP, 2009 WL 3562871, at *5 (N.D. Cal. Oct. 27, 2009); *Jackson v. Fastenal Co.*, No. 1:20-cv-00345-NONE-SAB, 2021 WL 5755583, at *12 (E.D. Cal. Dec. 3, 2021). The Court sees nothing in this case that overcomes or alters this presumption. Accordingly, the Court approves an enhancement payment of **$5,000**.

## V.   CONCLUSION

The parties' Second Renewed Motion to Approve PAGA Settlement is **DENIED**. (ECF No. 34.) The parties may elect to file an Amended Proposed

Settlement, and provided that it conforms to the rulings and directions herein, the Court will approve it without the need for an additional settlement approval motion. Alternatively, the parties may file another approval motion that makes a concrete, case-specific showing that one of the Court's assumptions or numerical findings herein is misguided. Whichever of these options the parties choose, the filing is due no later than **twenty-eight (28) days** from the date of this Order.

**IT IS SO ORDERED.**

February 4, 2022

_____
            **OTIS D. WRIGHT, II
   UNITED STATES DISTRICT JUDGE**